UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
TOWAKI KOMATSU,
                Plaintiff,

         - against -

UNITED STATES OF AMERICA, et al.,
                Defendants.
------------------------------------------------------------ x

**MEMORANDUM & ORDER**
Case No. 21-CV-1838

DEARIE, District Judge[*]

    Plaintiff, proceeding *pro se* and *in forma pauperis*, alleges principally that Court Security Officers ("CSOs") and members of the United States Marshal Service ("USMS") violated his constitutional, statutory, and other "rights" by harassing and mistreating him during his many visits to the federal courthouses in Manhattan from 2018 to 2022. Defendants move to dismiss the Second Amended Complaint. For the reasons that follow, the motion is granted.

## BACKGROUND

### I. Plaintiff's Allegations

    Towaki Komatsu is a New York City resident, U.S. Navy veteran, and frequent visitor to the federal courthouses in Manhattan. See Second Amended Complaint ("2AC"), ECF No. 145, at 17. Plaintiff's thirty-six causes of action stem from a wide-ranging series of interactions with CSOs and United States Marshals during his courthouse visits. Plaintiff's overarching theory of the case is that he has been the subject of a criminal cover-up by the USMS and CSOs since March 2018, causing him to be assaulted, stalked, and surveilled; his property damaged; and his reputation impinged. The Second Amended Complaint asserts that CSOs and employees of the federal judiciary, including judges, are "trash," see id. at 28, 12, and that the USMS is "a maggot-ridden junkyard mutt" that is a "criminal mob impersonating law-enforcement," id. at 66.

---

[*] Hon. Raymond J. Dearie, United States District Court for the Eastern District of New York, sitting by designation.

1

Each of Plaintiff's specific assertions regarding incidents with CSOs and the USMS over the course of 2018 are outlined below.

- On February 27, an unnamed CSO dropped Plaintiff's laptop approximately 3 feet while performing a security screening. Id. at 99.

- On February 28, when Plaintiff visited the courthouse to file a complaint regarding the previous day's laptop incident, CSO Galgano "lunged towards" Plaintiff, put him in a "bear hug," and ejected him from the courthouse. Id. at 101-04.

- On March 13, CSO Galgano called Plaintiff names ("smart-ass" and "dummy"), taunted him, discouraged him from filing an official complaint, and threatened to arrest him if he did not leave the courthouse. Id. at 104-05. CSO Morales also verbally harassed Plaintiff. See id. at 21, 105.

- On March 15, Plaintiff emailed the Department of Justice Internal Affairs Division and the USMS FOIA division and requested copies of all video recordings that captured his interactions with CSOs. Id. at 105-06. A representative from the USMS FOIA division informed Plaintiff that the recordings could not be provided because they had been overwritten. Id.

- On June 11, while observing a court proceeding, Plaintiff was approached by "CSO Death Threat,"[1] who asked to see Plaintiff's ID card. Id. at 32, 85-86. The CSO then read Plaintiff's identification information aloud, within earshot of others. Id.

- On July 9, while Plaintiff proceeded through courthouse security, CSO Morales blocked Plaintiff's path, leading to physical contact. Id. at 13, 28. CSO Rohrbacher observed this interaction but did not intervene. Id. at 29.

- On July 10, Plaintiff was followed through the courthouse by "CSO Bitch Boy," who called him "Bitch Boy." Id. at 29. During that visit, Marshal Brasgalla approached Plaintiff, requested his government ID, and took a photograph of his ID card. Id. at 38-39.

- On July 13, Plaintiff again spoke to Marshal Brasgalla as well as Marshal McHugh and asked them to prevent him from being followed by CSOs in the future. Id. at 37.

- On July 19, CSO Death Threat made a threat against Plaintiff. Plaintiff reported the threat to the Department of Justice Internal Affairs Division. Id. at 32.

- On August 7, Plaintiff was "stalk[ed], harass[ed], and threaten[ed]" by CSO Morales while CSO Foley and two other unknown CSOs stood by, before being ejected from the courthouse by Marshal Toro. Id. at 42, 22-24.

- On August 8, Plaintiff was followed through the courthouse by CSO Lui, leading to a "trap," id. at 27, where CSO Morales struck Plaintiff in the throat and tackled him, id. at 22. Plaintiff alleges that this altercation was prompted by CSO Morales "clearly telegraph[ing] that he was about to imminently assault" Plaintiff by "exhibiting a sharp and sudden twisting of his torso." Id. at 106.

---

[1] For the sake of clarity, this Order uses, but does not endorse, the nicknames Plaintiff has invented for many CSOs. Many of Plaintiff's inappropriate references to parties and judges have not been mentioned herein.

2

> In the course of this incident, Plaintiff was arrested and was later charged in federal court with assaulting and inflicting bodily injury on a CSO. See United States v. Komatsu, No. 18-cr-671, ECF No. 1 (S.D.N.Y. Aug. 8, 2018).[2] Following the arrest, Marshal Toro possessed Plaintiff's backpack, see 2AC at 40, and "CSO Dwarf" taunted Plaintiff, id. at 47-48.

- On September 21, CSO Morales used his Apple Watch to record a video of Plaintiff and others in the courthouse security area. Id. at 46-47.

- On September 26, Plaintiff was "stalked, harassed, and shouted at" by CSO Venturella in the public areas of the courthouse. Id. at 24-25.

Plaintiff's allegations resume in mid-2021. In June of that year, Plaintiff asserts he was "seized" and "assaulted" by CSO Kornas while in the security screening area of the courthouse. Id. at 48. Next, during an October 2021 courthouse visit, CSO Rohrbacher entered an elevator that Plaintiff and one other person were already in, potentially violating COVID-19 social distancing regulations. Id. at 14. In December 2021, two CSOs followed Plaintiff to the courthouse records room. Id. at 12. Finally, on May 24, 2022, CSO Larsen threatened Plaintiff, dropped Plaintiff's USB thumb drive, and caused an image of Plaintiff's face to be shown on a security screen that was visible to the public. Id. at 34-35.

In addition to the above allegations, the Second Amended Complaint names several miscellaneous parties. The Complaint lists the City of New York as a defendant, claiming that the City violated a sealing order issued in another unrelated case, People v. Komatsu, 2017BX48917 (Bronx Crim. Ct. Jan. 23, 2020), by releasing to CSOs and the USMS a headshot taken of Plaintiff after his arrest by the New York Police Department in December 2017. See 2AC at 17. Plaintiff also names New York University and the American Bar Association as defendants. His claims against these entities arise out of the fact that NYU and the ABA each published a report that referenced an article in the Duke Law Journal that itself referenced Mr. Komatsu's August 8, 2018 arrest. See 2AC at 53-54.

## II. Procedural History

Plaintiff initiated this action on February 26, 2021. ECF No. 2. Because his initial complaint named as defendants numerous officials of the Southern District of New York, including three judges in

---

[2] This criminal complaint also charged Plaintiff with one count of threatening bodily injury to a CSO arising out of his July 9, 2018 courthouse visit. Id. All charges were later dismissed on motion of the government. See United States v. Komatsu, 18-cr-651, ECF No. 20 (E.D.N.Y. Oct. 16, 2019).

the District, the case was reassigned to the undersigned on May 21, 2021. This Court *sua sponte* dismissed with prejudice Plaintiff's claims against Judge Colleen McMahon, Judge Lorna Schofield, Magistrate Judge Gabriel Gorenstein, Assistant United States Attorney Sarah Mortazavi, Roseanne Dempsey, Jennifer Behrens, Johnathan Hall, Duke University, and Google, Inc., concluding the claims against these parties were frivolous and, as to the judges and AUSA, barred by absolute immunity.[3] ECF No. 13. Plaintiff filed a motion for reconsideration, ECF No. 44, which was denied, ECF No. 52.

Since initiating this litigation, Plaintiff has filed dozens of letters to the Court, which range from winding and uncivil to ranting and plainly vulgar. The Court has read each letter but has responded only when necessary. See ECF No. 160.

Plaintiff filed an Amended Complaint on January 14, 2022. See ECF No. 112. On April 11, 2022, the Court granted him leave to amend his complaint once more. See ECF No. 133. Mindful of Plaintiff's *pro se* status, the Court's April 11 Order explained that, pursuant to Federal Rule of Civil Procedure 8, any amended complaint should be "short and plain." Id. at 1. The Court also referred Plaintiff to the Pro Se Legal Assistance Project as a resource in preparing an amended complaint. Id. Despite the Court's instructions, the Second Amended Complaint, which was filed on June 2, 2022, covers 141 pages, raises 36 claims for relief, and names 40 defendants. The individual defendants are sued in their official and individual capacities. See 2AC at 51.

Defendants timely served their motions to dismiss by July 11, 2022. See ECF Nos. 153, 154, 155. Three motions to dismiss were filed: one by the federal defendants;[4] one by Centerra Group ("Centerra")

---

[3] Plaintiff re-names some of these defendants—Jennifer Behrens, Roseanne Dempsey, Johnathan Hall, and Duke University—in his Second Amended Complaint and reiterates some of his claims that were previously dismissed. See, e.g., 2AC at 51-52 (stating claims of wrongdoing by Roseanne Dempsey); id. at 55 (requesting relief against Google, Inc.). For the avoidance of doubt, the Court incorporates its reasoning in ECF Nos. 13 and 52 herein and again dismisses all claims against these defendants with prejudice.

[4] The federal defendants' motion to dismiss was filed on behalf of the United States and the following officials: Jason Brasgalla, Deputy Marshal; Brian McHugh, Deputy Marshal; Leonardo Toro, Deputy Marshal; Michael Greco, former Chief Marshal; Ralph Sozio, current Chief Marshal; Angela Chappelle Brooks, employee in the USMS General Counsel's office; and Donald Washington, former director of the USMS.

4

and its CSO employees;[5] and one by Inter-Con Security Systems ("Inter-Con").[6] After requesting and receiving extensions to respond to the motions to dismiss,[7] Plaintiff filed an "Affirmation in Opposition" to the federal defendants' motion to dismiss on September 8, 2022, which the Court will construe as Plaintiff's brief in opposition. See ECF No. 171 ("Pl. Opp."). Plaintiff did not respond to the Centerra or Inter-Con motions to dismiss. Defendants served their reply briefs on September 29, 2022.

## LEGAL STANDARDS

On a Rule 12(b)(1) motion, the court must dismiss a claim if it lacks the statutory or constitutional power to adjudicate it. Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Id. The court must "take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must draw all reasonable inferences in the plaintiff's favor and accept all well-pleaded factual allegations as true. Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[5] The Centerra-represented CSOs are CSO Foley, CSO Johnson, CSO Kornas, CSO Morales, CSO Quealley, CSO Rohrbacher, and CSO Venturella.

[6] Several defendants did not file motions to dismiss: American Bar Association; City of New York; New York University; "USMS FOIA John Doe"; CSOs Galgano, Kamien, Larsen, and Lui; and all the CSOs who are referred to by nickname only.

[7] Mr. Komatsu's extension requests often explained that he was unable to meet deadlines because he was preoccupied by working on his many other lawsuits. See, e.g., ECF No. 166 at 1-2. Mr. Komatsu is indeed a frequent filer of lawsuits in the Southern District of New York and elsewhere. See 2AC at 3 (listing ten other lawsuits Mr. Komatsu is currently party to).

alleged," meaning the plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

Where, as here, a plaintiff proceeds *pro se*, the court has an obligation to construe his submissions liberally and to interpret them to raise the strongest arguments possible. McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 156 (2d Cir. 2017). However, "notwithstanding the liberal pleading standards afforded to *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if they lack subject matter jurisdiction." Jiles v. Rochester Genesee Reg'l Transp. Auth., 317 F. Supp. 3d 695, 700 (W.D.N.Y. 2018) (cleaned up). Even in a *pro se* case, the Court should not accept unsupported or conclusory allegations, or threadbare recitals of the elements of a cause of action, devoid of sufficient facts. Chavis v. Chappius, 618 F. 3d 162, 170 (2d Cir. 2010).

## DISCUSSION

### I. Claims Against the United States

It is axiomatic that, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475 (1994). The sovereign immunity bar is "jurisdictional in nature." Id. Accordingly, a suit against the United States without a waiver of sovereign immunity must be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1). See Wake v. United States, 89 F.3d 53, 57 (2d Cir. 1996). Because a suit against a federal officer acting in his or her official role is the functional equivalent of a suit against the government, immunity also bars suits against federal officers named in their official capacities, unless such immunity is waived. See Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).

Plaintiff's pleadings invoke the Federal Tort Claims Act ("FTCA"), which waives sovereign immunity for "claims against the United States, for money damages, . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . ." 28 U.S.C. § 1346(b)(1); see 2AC at 16; Pl. Opp. at 9-10. However, the FTCA's waiver of sovereign immunity is limited, and a plaintiff must strictly comply with the statute's numerous procedural conditions before a

6

court can entertain an FTCA claim. See Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007); Adelke v. United States, 355 F.3d 144, 153 (2d Cir. 2004).

One such limitation is the administrative presentment requirement: before bringing a lawsuit under the FTCA, a plaintiff must first present his claims to the appropriate federal agency and wait until that claim is denied. See 28 U.S.C. § 2675(a). "This procedural hurdle applies equally to litigants with counsel and those proceeding *pro se*." Adeleke, 355 F.3d at 153. Yet, when Plaintiff commenced this action on February 26, 2021, he had not filed any administrative claim with the USMS giving notice of the claims he now pursues. See ECF 180 ("Bryan Decl.") ¶ 6. Nor has Plaintiff demonstrated that his informal communications with USMS officials contained a written claim for a sum certain—a necessary component of any administrative claim for FTCA purposes—so these communications cannot satisfy the presentment requirement.[8] See Johnson v. Smithsonian Inst., 189 F.3d 180, 190 (2d Cir. 1999), abrogated on other grounds, United States v. Kwai Fun Wong, 575 U.S. 402 (2015). Although Plaintiff did submit a formal complaint with the USMS on September 24, 2021, see Bryan Decl. ¶ 5, that filing six months after this action commenced does not cure Plaintiff's failure to comply with the presentment requirement at the outset of the action, see Finelli v. Drug Enf't Agency, No. 92-cv-3463, 1993 WL 51105, at *3 (S.D.N.Y Feb. 24, 1993) (holding that § 2675 was not satisfied when a plaintiff sent a letter giving notice of his claim to the relevant federal agency two months after commencing his civil action because exhaustion of the administrative claim is a prerequisite to filing a civil action). Plaintiff's failure to comply with the administrative exhaustion requirement is fatal to his FTCA claim. See Foster v. FEMA, 128 F. Supp. 3d 717, 728 (E.D.N.Y. 2015) ("Failure to comply with [the administrative exhaustion] requirement results in dismissal of the suit.").

Other than the FTCA, none of the statutes cited by Plaintiff vest the Court with jurisdiction over his claims against the federal government sufficient to overcome sovereign immunity. See 2AC at 16.

---

[8] Cf. Pl. Opp. at 10 (claiming that Plaintiff satisfied the FTCA's administrative presentment requirement "as early as March of 2018 . . . through timely emails that I sent to the USMS about my claims . . . [and] through face-to-face conversations that I had with Brian McHugh and Jason Brasgalla prior to 8/1/18").

Plaintiff's constitutional claims against the United States are also barred because the government has not waived sovereign immunity for claims brought under the Constitution itself. See Meyer, 510 U.S. at 478. "Constitutional tort claims instead must be brought against individual federal agents or employees in their individual capacities through a Bivens action[,]" as discussed in Section II, *infra*. Davila v. Gutierrez, 330 F. Supp. 3d 925, 937 (S.D.N.Y. 2018).

Plaintiff's claims against the United States and against all federal officials in their official capacities are dismissed for lack of subject matter jurisdiction.

## II. Remaining Constitutional Claims

Congress has never created a damages remedy for unconstitutional acts by federal officials acting in their individual capacity. Instead, suits seeking money damages for constitutional violations may proceed against federal officers (named in their individual capacities) only pursuant to the limited implied right of action first recognized by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). Over the past half-century, the Court has endorsed such a claim in only three instances: (1) unlawful search of a home and warrantless arrest in violation of the Fourth Amendment, Bivens, 403 U.S. at 395-97; (2) employment discrimination based on gender in violation of the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228 (1979); and (3) inadequate medical treatment of a prisoner, resulting in the prisoner's death, in violation of the Eighth Amendment, Carlson v. Green, 446 U.S. 14 (1980). "After those decisions, however, the Court changed course." Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020). Today, the Supreme Court has warned, expanding Bivens is a "disfavored" judicial activity. Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017).

Cautioning courts to pause before permitting a Bivens claim to proceed, the Supreme Court has developed a rigorous two-step inquiry, which, *first*, instructs a court to assess "whether the case presents a 'new Bivens context'" and, *second*, if the claim does arise in a new context, instructs that "a Bivens remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" Egbert v. Boule, 142 S. Ct. 1793, 1803 (2022) (quoting Ziglar, 137 S. Ct. at 1859, 1858). This test has

had the effect of foreclosing Bivens actions in cases with facts that differ from those presented in Bivens, Davis, and Carlson.

Turning to the first step of this inquiry, we consider whether Plaintiff's allegations arise in new Bivens context. "If the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court, then the context is new." Ziglar, 137 S. Ct. at 1859.[9] Mr. Komatsu asserts that federal officials violated his rights under the Fourth Amendment and the Fifth Amendment's Due Process Clause by following him; failing to prevent CSOs from following him; taking his photograph; possessing his backpack; and forcing him to leave the courthouse. Like the plaintiff in Bivens, Mr. Komatsu complains of Fourth Amendment violations, but beyond invoking the same constitutional provision, his allegations differ in every way from those in Bivens, which involved federal narcotics agents entering the plaintiff's apartment, arresting him, and searching his home "from stem to stern," all without a warrant. 403 U.S. 389. Here, the defendants are United States Marshals, and the setting is a federal courthouse—a public place, owned and controlled by the federal government. The alleged "search" of Mr. Komatsu's person here was visual, not physical, and the "seizure" was of his backpack, not of his body.

Plaintiff's Fifth Amendment claims also present a new context. Davis held that the Due Process Clause of the Fifth Amendment gave an administrative assistant a cause of action against her employer, a United States Congressman, who fired her because she was a woman. See 442 U.S. at 230-31. Here, Plaintiff's Fifth Amendment claims complain of stalking, not gender discrimination, by the United States Marshals, not an elected federal legislator. These facts are different at every level.

Having readily found that Plaintiff's claims arise in a new context, the Court must proceed to the second step of the Bivens inquiry: if there are any "special factors" that counsel against expanding an

---

[9] The Ziglar Court elaborated by providing the following non-exhaustive list of "differences that are meaningful enough to make a given context a new one[:] . . . the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider." 137 S. Ct. at 1859-60.

implied right of action into this new context, the Bivens claim must be rejected. Egbert, 142 S. Ct. at 1803. The Supreme Court has repeatedly counseled that the availability of alternative remedies providing similar relief is one such special factor. See, e.g., id. at 1806-07. Here, several remedial structures exist to protect parties like Plaintiff from mistreatment at the hands of USMS officials. The Director of the USMS is required by statute and regulation to supervise USMS personnel and to investigate allegations of improper conduct. See 28 U.S.C. § 561(g); 28 C.F.R. § 0.111(n). Moreover, as described above, the USMS accepts complaints from aggrieved parties and operates a comprehensive administrative complaint system for members of the public.[10] As in Egbert, these "alternative remedies for aggrieved parties in [Plaintiff's] position" constitute special factors that "foreclose a Bivens action here." 142 S. Ct. at 1806. Because Plaintiff cannot bring a Bivens action to assert constitutional claims against any of the federal defendants, these claims must be dismissed.[11]

Many of Plaintiff's constitutional claims are also asserted against one or more non-federal defendants, including Inter-Con and Centerra, both private businesses, and individual CSOs, who were employees of either Inter-Con or Centerra, not of the federal government. See 2AC at 17-18 ("Intercon was the direct employer of CSOs who it provided to the USMS on an outsourcing basis to work inside [the courthouses] . . . The USMS has replaced Intercon with Centerra to provide it CSOs who work [in the courthouses].").[12] In Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001), the Supreme Court

---

[10] See https://www.usmarshals.gov/who-we-are/office-of-professional-responsibility (last accessed January 18, 2023) (outlining process for reporting allegations of misconduct to the USMS Office of Professional Responsibility).

[11] The Second Amended Complaint also states that this action is "brought pursuant to" 28 U.S.C. § 1983. See 2AC at 16. Broadly construed, this language may intend to invoke § 1983 as an alternative vehicle to Bivens for Plaintiff's constitutional claims. But § 1983 provides a cause of action for constitutional violations only against officials acting under the color of the law "of any State or Territory or the District of Columbia," and Plaintiff has not named any state government officials in this action, nor has he alleged that any of the privately employed defendants were acting under color of state law. Any claim brought pursuant to § 1983 is thus dismissed.

[12] See also https://www.usmarshals.gov/what-we-do/judicial-security (last accessed January 18, 2023) ("Are the security officers who staff the entrance of the federal courthouse deputy U.S. Marshals? No. The entrance station of a federal courthouse is staffed by Court Security Officers (CSOs), highly-trained men and women who are employed by private security companies awarded a security contract by the U.S. Marshals Service."). The Second Amended Complaint alleges in passing that the CSO defendants each "have 2 employers": the USMS and either Inter-Con or Centerra. 2AC at 18. The only support Plaintiff puts forth for this conclusion is that "[t]he USMS controls how people who work as CSOs operate." Id. But this single allegation does not "nudge" Plaintiff's claim that the USMS

held that a Bivens remedy is foreclosed against private corporate entities like Inter-Con and Centerra, even if that private entity has contracted with the federal government to provide services. See id. at 71 (rejecting Bivens suit against corporation that managed a prison under contract with the federal government). Eleven years later, the Court held in Minneci v. Pollard, 565 U.S. 118 (2012), that a Bivens-style constitutional cause of action is also unavailable against employees of a private corporation hired as a federal contractor, at least insofar as the alleged misconduct "is of a kind that typically falls within the scope of traditional state tort law." Id. at 131. Minneci's rule applies here, where traditional state law tort causes of action, such as those for assault and battery, provide an alternative avenue for addressing the CSO conduct that Plaintiff complains of. Without a cause of action under Bivens, Plaintiff's constitutional claims against Inter-Con, Centerra, and their privately-employed CSOs must be dismissed.

### III.     The Remaining Federal Claims

Having disposed of Plaintiff's constitutional claims, the Court turns to Plaintiff's federal statutory causes of action, which are dismissed for failure to state a claim.[13]

Plaintiff states that this action is brought pursuant to three civil rights statutes, 42 U.S.C. §§ 1985, 1986, and 1988, but he fails to state a claim under any of these statutes. First, although the Complaint fails to specify which of § 1985's three subdivisions Plaintiff intends to invoke, only § 1985(3) is relevant here.[14] That provision creates a civil action for damages against two or more persons who "conspire . . . for the purpose of depriving" a plaintiff "of the equal protection of the laws, or of equal privileges and

---

*employs* CSOs across the line from conceivable to plausible. See Iqbal, 556 U.S. at 680. Rather, Plaintiff's assertion that CSOs are federal employees is wholly conclusory and "not entitled to be assumed true." Id. at 681. In fact, this assertion is undercut by Plaintiff's other statements, including the claim that Inter-Con and Centerra "operate as recruiting agencies that . . . pay the salaries of people who work as CSOs" and have "responsibility for providing proper training, supervision, and discipline to people that [they] ha[ve] employed as CSOs." 2AC at 18.

[13] This conclusion applies equally to Plaintiff's claims against those defendants who did not file motions to dismiss as it does to the claims against defendants who did file motions to dismiss. See 28 U.S.C. § 1915(e)(2)(B)(ii) (in any action where the plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted.").

[14] Section 1985(1) provides a damages action against two or more persons who conspire to prevent, by force, intimidation or threat, any federal officer from performing his official duties. Section 1985(2) provides a cause of action against two or more persons who conspire to obstruct justice in the federal courts by force, intimidation, or threat. None of the facts alleged in the Second Amended Complaint relate in any way to these causes of action.

immunities under the laws." 42 U.S.C. § 1985(3). But § 1985(3) requires that there be some racial or otherwise class-based invidious discriminatory animus for the conspiracy. See Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994). Plaintiff has not alleged that any defendant acted with racial animus or other invidious discrimination based on a protected class, so he does not state a viable claim under § 1985(3). Without a viable claim for relief under § 1985, Plaintiff cannot establish a violation of § 1986, because "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985." Id. Finally, Plaintiff's claim under § 1988 fails because § 1988 is a procedural statute relating to attorneys' fees and does not itself provide a cause of action. See Roundtree v. City of New York, 778 F. Supp. 614, 618 (E.D.N.Y. 1991).

Plaintiff's 36th Claim for Relief states that "multiple acts of mail and wire fraud since 2018" entitle Plaintiff to relief under 18 U.S.C. § 1964(c), the civil remedies provision of the Racketeer Influenced and Corrupt Organizations (RICO) statute. 2AC at 117. But Plaintiff's allegations, see id. at 135-36, are no more than threadbare recitals of the elements of a RICO cause of action, and are too conclusory to survive, see Iqbal, 556 U.S. at 678. For example, Plaintiff alleges that two acts of wire and/or mail fraud "committed by personnel of Intercon and the USMS were in furtherance of a conspiracy," and that this "caused [Plaintiff] economic harm." 2AC at 136. These conclusory assertions, which merely recite certain Civil RICO elements, do not state a claim for relief. See Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting Twombly, 550 U.S. at 557)). Plaintiff's Civil RICO claim is dismissed.

**IV.     State Tort Claims**

The only remaining claims for relief are Plaintiff's numerous state tort claims. For these non-federal claims to survive, the Court would need to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The Court declines to do so and dismisses these claims without prejudice. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### V.  Claims Against the City of New York, American Bar Association, and New York University

While the City of New York, American Bar Association, and New York University have not filed motions to dismiss, the Court dismisses the claims against these defendants pursuant to 28 U.S.C. § 1915, which instructs courts to dismiss any claim brought by a plaintiff proceeding *in forma pauperis* that is frivolous or fails to state a claim on which relief may be granted.

Plaintiff plainly fails to state a claim on which relief may be granted against the City of New York. While Plaintiff's introductory section describes his concern that the City violated a Bronx Criminal Court sealing order by providing his mugshot to the USMS, see 2AC at 17, he fails to name the City as a defendant in any of his 36 causes of action. Plaintiff's action against the City must be dismissed.

Plaintiff's claims against New York University and the American Bar Association are also dismissed. Plaintiff brings numerous causes of action against these defendants, including "Public and Private Nuisance" and "Violation of my Fourteenth [Amendment] Liberty Rights to Pursue Occupations and a Livelihood . . . Through Employment and Litigation," to name a few examples. As the factual predicate for these claims, Plaintiff asserts that NYU and the ABA "republished information on the Internet that consisted of Johnathan Hall's lies about me," in reference to an article written by Mr. Hall in the Duke Law Journal. 2AC at 53. The "lies" in Mr. Hall's article are recitations of the events leading to Mr. Komatsu's August 8, 2018 arrest, derived from a Memorandum & Order issued by Magistrate Judge Tiscione in Plaintiff's federal criminal case. See Johnathan Hall, Note, The Gorsuch Test: *Gundy v. United States*, Limiting the Administrative State, and the Future of Nondelegation, 70 DUKE L.J. 175, 209-10 (2020) (citing United States v. Komatsu, 18-cr-651, 2019 WL 2358020 (E.D.N.Y. June 4, 2019)).

As I explained in my Order dismissing Plaintiff's claims against Mr. Hall and Duke University, Mr. Hall's article "describes a matter of public record," so "there is no arguable legal basis or theory that would entitle Plaintiff to relief" based on the article. ECF No. 13. This logic applies with even greater

force to the claims against NYU and the ABA. These organizations did not pen the "lies" Plaintiff complains of; rather, they published a report on developments in administrative law, and that report mentioned Mr. Hall's article. Based on the pleadings, it is not clear whether the report even contained Plaintiff's name; it apparently did no more than discuss Mr. Hall's article generally. See 2AC at 53-55 NYU and the ABA did not violate Plaintiff's rights by publishing a report that mentioned an article, which itself mentioned Plaintiff's criminal case, with facts taken from a publicly available Order issued by a United States Magistrate Judge. These facts do not give rise to any cognizable cause of action and require dismissal.

### VI.    Request for Injunctive and Declaratory Relief

In the Second Amended Complaint and other filings, Plaintiff implores the Court to grant him assorted forms of injunctive relief. Many of his requests are fanciful, see, e.g., 2AC at 126 ¶ 14(a) (asking the Court to order the federal government to hire Plaintiff for a job to be paid $600,000 annually), or downright offensive, see, e.g., id. at 127 ¶ 15(a). (asking the Court to authorize Plaintiff to "[d]isplay[] images of CSOs, members of the USMS, judges, and anyone else. . . on signs . . . taped to my ass and crotch while I stand, sit, and walk inside" federal courthouses). To the extent Plaintiff's filings can be construed as requests for a preliminary injunction, such requests are denied. To obtain injunctive relief, a movant must establish, *inter alia*, that he will suffer irreparable harm in the absence of a court-ordered injunction. See CRP/Extell Parcel I, L.P. v. Cuomo, 394 Fed. Appx. 779, 781 (2d Cir. 2010). The Second Circuit has "long held that an injury compensable by money damages is insufficient to establish irreparable harm." Id. Yet all the harms Plaintiff complains of, including damage to property and reputation and resulting difficulties finding employment, can be compensated by a monetary award; they do not rise to the level of irreparable injury necessary to obtain injunctive relief. See Ahmad v. Long Island Univ., 18 F. Supp. 2d 245, 248 (E.D.N.Y. 1998).

Plaintiff's pleas for declaratory relief are similarly denied. The Second Amended Complaint contains a litany of requests that the Court "declare" as true certain facts and legal conclusions put forth by Plaintiff. District courts possess discretion in determining whether and when to entertain an action

seeking declaratory relief, see Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995), and the Court exercises its discretion to abstain from wading into Plaintiff's numerous requests for declaratory relief, many of which are facially unmeritorious, see, e.g., 2AC at 131 ¶ 27 (asking the Court to "[d]eclar[e] that the USMS and CSOs have proven to be domestic terrorists in regards to how they have conducted themselves towards [him]").

## CONCLUSION

It is well established that a *pro se* complaint should not be dismissed "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Gomez v. USAA Fed. Sav. Bank, 171 F. 3d 794, 795 (2d Cir. 1999) (internal quotation removed). Here, Plaintiff has amended his pleadings not once, but twice. Furthermore, before Plaintiff filed the current complaint, the Court provided guidance regarding compliance with the Federal Rules of Civil Procedure and referred Plaintiff to the Pro Se Legal Assistance Project. See ECF No. 133. Despite this special solicitude, the Second Amended Complaint fails to state a single claim that can survive. In the Court's judgment, further amendment would be futile. See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (explaining that when a complaint's flaws are "substantive," and "better pleading will not cure it," "repleading would . . . be futile," so leave to replead should not be permitted).

Accordingly, Plaintiff's claims against the United States and its officials named in their official capacity are dismissed with prejudice for lack of subject matter jurisdiction. The remaining federal claims are also dismissed with prejudice for failure to state a claim, as are the claims against defendants City of New York, American Bar Association, and New York University. The state tort law claims are dismissed without prejudice to replead in state court. Finally, Plaintiff's requests for injunctive and declaratory relief are denied.

SO ORDERED.

Dated:  Brooklyn, New York                                              /s/ Raymond J. Dearie
        January 19, 2023                                                 RAYMOND J. DEARIE
                                                                         United States District Judge